The possession of a part of a tract circumscribed by marked lines is a possession of the whole tract within these lines. If the defendant and those under whom he claims possessed the part mentioned in the evidence, claiming under Guthrie's patent, their possession extends to the lines of that patent and no further; but if they possessed this part, claiming as far as the lines of the 100-acre tract, then their possession extends to the whole tract. "A naked possession for seven years, without entry or claims, will bar the right of entry of all adverse claimants; and a possession with a color of title for seven years will give to the defendant in possession an absolute right against all others forever."
This distinction, observes Mr. Haywood, between a seven years' naked possession and a seven years' possession with color of title is, as I apprehend, founded upon a wrong construction of the act of limitations. It supposes the second section was intended to operate upon future cases in such manner as to give a right to the defendant, and that the third section was intended to operate by tolling the plaintiff's entry, or taking away his rightful possession, so as to disable him from recovering in ejectment, without affecting the property or mere right, which he may recover in a writ of right. I shall attempt to show that this construction is erroneous, and to point out the genuine and true meaning of the act, it being of very great importance to the public that this act should not be misunderstood.
First, then, as to the second clause: It was passed in the year 1715, prior to which period no office for the registration of deeds and mesne conveyances had been established; consequently, bargains and sales were not used in this country, for they were void unless enrolled within six months. The act of 1715, ch. 28, first established these offices. Fines and recoveries were not in use. That is declared in the preamble of the act of 1715, ch. 28: Feoffments or livery and seisin are spoken of in the sixth section of 1715, ch. 38, as a mode of conveyance practiced in Great Britain, implying that it was not in this country. There is no vestige upon the records of any court to show it ever was practiced in this country prior to 1715. There could not have been, then, any certain known mode of conveyance by which one individual could convey lands to another; and this difficulty, we may readily suppose, was rendered not the less perplexing by the illiterateness of the first settlers. All or the *Page 21 
greater part of the conveyances which had been made must have been liable to be invalidated for want of legal forms and solemnities. We learn from the act itself that the creditors had sold or caused to be sold the lands of their debtors, though there was no law for the sale of debtors lands until 5 Geo. II., ch. 7, in 1732. Executors and administrators had sold lands, which no law justified; husbands and wives had sold the lands of the wives, which was illegal before the act of 1715, ch. 28; or husbands had sold the (24) lands of their wives, for which there never was any law; and sometimes, patentees, knowing of no better mode, had conveyed by indorsement of patents, or by some other similar means. All such conveyances were invalid; every possessor under such titles was liable to be ousted. Under such circumstances the country must necessarily have been in a state of great inquietude. There existed two great evils, demanding the interposition of the Legislature: first, the want of a certain established mode of conveyance; secondly, a confirmation of the titles thus irregularly obtained. The first they remedied at this session by the two acts of 1715, ch. 28, entitled, "Femecoverts, how to pass lands," and 1715, ch. 38, entitled, "An act to direct the method to be observed in conveying lands," etc. The latter they provided for by the clause now under consideration. All possessions of or titles to any lands derived (not which shall be derived) from any sales made, either by creditors or administrators of any person deceased, or by husbands and their wives, or husbands in right of their wives, or by indorsement of patents or otherwise, of which the purchaser or possessor or any claiming under them have continued or shall continue in possession of the same for seven years, without any suit in law, be and are hereby ratified, confirmed and declared good and legal to all intents and purposes whatsoever, against all and every manner of persons, etc. Here is not any exception in favor of infants, feme coverts, etc. When speaking of titles, it mentions them in the perfect tense, "derived," equivalent to "already derived," because such only were the titles they intended to ratify. But, considering that some such titles had been derived within seven years next before that session, and would not be ratified for want of a seven years' possession, unless provision were made for them, when they came to speak of that they use both the perfect and future tense, "have continued or shall continue," the former relating to titles made more than or as long as seven years before; the latter to titles derived within seven years before, but which were equally with the others to be ratified, provided a seven years' possession should be completed, though part of it might be after the act. They speak of them as invalid titles (though many of them, such as those by indorsement of patents and by husbands and wives, came from those who actually had the title and were certainly good unless for want of legal form), which shall be ratified and declared good and legal, importing that they were not so but for the act. Now, the General Assembly could not mean to ratify and confirm such illegal conveyances if made afterwards; for, in order to prevent the like inconveniences and inquietudes for the future, they at this session declared how lands shall be conveyed; and, moreover, that no conveyance shall be good unless acknowledged or proved and registered. Shall all such unproved, unacknowledged and unregistered titles as those mentioned in the second clause, and which are here expressly prohibited, be still continued and still practiced and confirmed? Did they suppose, notwithstanding the act *Page 22 
pointing out and ascertaining the legal method of conveyance, that the irregular methods mentioned in the second clause would still be used? The contrary is certainly evident. They could not have supposed that after this session the people of this country would so generally disregard the mode prescribed as to make it expedient beforehand to provide for such irregularities; and, therefore, the second clause must have been made with a retrospective view. Again, there is no exception in this clause in favor of feme coverts, etc. But the titles here spoken of are to be confirmed and declared good and legal against all and all manner of persons. The object of the Legislature, that of quieting the country with respect (25) to all existing causes of uneasiness, requires that no exception should be made; for then feme coverts, infants and the heirs of such, might still be a cause of apprehension to great numbers of settlers, and the remedy would be partial and incomplete. Whereas, they intended an effectual and complete one, which in three or four years should put all things in quietness. Therefore, the exception was designedly omitted out of this clause, and the strong expression, "all and all manner of persons," inserted, though that exception is made in the third clause. Now, to try the effect of the second clause: let it be admitted that it has an operation upon future cases, and suppose a husband has conveyed the land of the wife since the act, and that the possessor has continued seven years in peaceable possession, the wife being alive all the time: will such a possessor have a good right forever, against all and all manner of persons, the feme covert not excepted, although in the exception to the third section her title is saved to her till after the coverture? Either the possessor will not have a title under the second clause or the feme covert will lose hers, though saved by the fourth; or the repugnance must be avoided by giving to the second clause a retrospective and not a future operation, in which case the whole is consistent. Again: Let us suppose that the husband and wife, since the act, have joined in a conveyance of the wife's lands, as directed by 1715, ch. 28: would not such conveyance be good without the aid of the act of limitations? And would it not follow that the Legislature were occupied to no purpose when busied in declaring that such conveyance should be confirmed when or after the lands should have been possessed for the space of seven years? And as such a conveyance, before the act, did really stand in need of assistance aliunde, is it not fair to conclude the clause in question respected such a conveyance made before the act, but not such a one when made after it? It may be further observed that if by this clause the defendant's title be ratified forever as to future cases, it is a perpetual bar to the plaintiff; and then, if it can be shown as to future cases that the third clause operates also as a bar to the plaintiff, it follows either that both clauses are for the same purpose (which cannot be imagined) or that the second regards past transactions, whilst the third and fourth regard future ones; and it will also follow that the second bars perpetually, when there is possession with color of title; and the third bars by possession without color, as the opinion I am controverting supposes; that either the second is useless (for why require color of title, when the next clause dispenses with it altogether, and forms a complete bar without it, producing the very same effects without as the former does with it?) or that the second respects past transactions only. Now, what say the third and fourth clauses? No person shall enter or make claim but within seven *Page 23 
years, and in default shall be disabled from any claim thereafter to be made, except feme coverts, etc., who have a longer time allowed: "But that all such possessions, without suing such claim as aforesaid, shall be a perpetual bar, etc." If a naked possession, as the opinion supposes, under these clauses, will work a bar, is not that bar, however operated, a perpetual one? And admitting the plaintiff to be perpetually barred, the defendant's title is perpetually confirmed; and then the third and fourth clauses, without any color of title, operate the same effects precisely as the second clause with color of title, and consequently the second was never of any use, unless it related to titles before the act; which, if it did, it was as beneficial and as useful a clause as any in the act. These considerations seem to me to prove that the second clause has not a prospective view, and that with regard to it as relating to cases after the act, it is erroneous to say a color of title with seven years' possession will give a right in fee. For, though a color of title with seven years' possession does, as I contend, really have that operation, (26) it is not by reason of anything contained within the second clause, but arises from the true construction of the third and fourth clauses. I think it may therefore be fairly concluded that the latter member of the above distinction, as founded on this clause, is not warranted by it.
And this brings us to the other part of the distinction, namely, that a naked possession for seven years tolls the right of entry of the plaintiff, and bars his ejectment, but not his writ of right. This is a construction upon the third and fourth clauses, and I shall endeavor to show that it is equally erroneous with the other. In addition to controversies arising from informal conveyances, there were others of a different complexion: conveyances made or to be made by persons having no title, though seeming to have one, or being understood to have it. Before the extension of the boundary line between Carolina and Virginia, lands supposed to lie in Virginia had been granted by the Governors thereof, and had been neglected and deserted by the patentees, and had been again granted by the lords proprietors. Entries of lands had been made in the land office, and the same lands were afterwards entered by others. All this appears in the preamble of the act; and by such means (as another part of the act complains of) titles had become so perplexed that no one knew of whom to take or buy lands. If he purchased from a patentee or grantee under him, an elder title might be produced and he be turned out of possession. Thus it happened, as the act also complains, that the dread of elder titles and the expectation of heirs, under dormant deeds and grants, were "likely in a short time to leave much land unpossessed." It was necessary to remove these obstacles to population, and to that end to provide some criterion by which a man might know of whom to buy lands, notwithstanding the several conflicting grants or deeds for the same; and to insure him of security, notwithstanding there might be unknown prior grants to that under which he purchased. Every instance given, either in the preamble or body of the act, evinces an intention to settle disputes between claimants under opposite deeds or grants for the same land. Ancient titles to lands granted by the Governor of Virginia were likely to disturb those who had obtained titles here (for I understand such grants were legalized by compact between the King and the lords proprietors); or the lands had been deserted by the first patentees and a later patentee had taken possession; or *Page 24 
former entries or patents threatened the titles or possessions under later entries or patents, and proves that the person to be protected by the provisions of the act was one who had an appearance or color of title by a subsequent deed or grant, as well as the person to be barred. Such were the evils to be remedied, and such the design of the Legislature. And they have applied the remedy in the following words: "No person nor persons nor their heirs, who hereafter shall have any right or title to any lands, tenements or hereditaments, shall enter thereunto, or make claim, but within seven years next after his, her, or their right or title which shall descend or accrue; and in default thereof such person or persons so not entering or making default shall be utterly excluded and disabled from any entry or claim thereafter to be made. If any person that is or shall be entitled to any right or claim of lands, tenements or hereditaments shall be at the time the said right or title first descended or accrued, come or fallen, within the age of twenty-one years, feme covert, non composmentis, imprisoned or beyond seas, that then such person or persons shall and may, notwithstanding the said seven years be expired, commence his, her or their suit, or make his, her or their entry, as he, she or they might have done before this act; so as (27) such person or persons shall within three years next after full age, discoverture, coming of sound mind, enlargement out of prison, or persons beyond seas within eight years after the title or claim becomes due, take benefit and sue for the same; and at no time after the times and limitations herein specified. But that all possessions held without suing such claim as aforesaid shall be a perpetual bar against all and all manner of persons whatsoever; that the expectation of heirs may not in a short time leave much land unpossessed, and titles so perplexed that no man will know of whom to take or buy lands." Upon these clauses the opinion in the case of Armour v. White admits that an adverse possession is necessary, for this is implied in the words "enter or claim," each of which technically signifies a getting of the legal possession from one who is actually in possession, either by going upon the land or claiming as near to it as he dare go, for fear of the possessor; and is unequivocally expressed in the exception to the third clause, "but that all possessions held without suing such claim as aforesaid," etc., referring to the terms used in the third clause, and signifying the understanding of the Legislature to be that such claims as are spoken of in the third clause were to be exerted within the limited time against some actual possession. So far, the opinion is right; for it would be absurd to say a good title shall be barred by not entering within seven years, when no adverse claim or possession hath been set up. But whence is it inferred that these claims bar the right of entry only? The policy of the act was that settlers should know of whom to purchase with safety — not a temporary title, capable of resisting an ejectment only, but a permanent one, capable of encouraging to clear, cultivate and improve the lands, and such as they might transmit to posterity; and answerable to this policy, the possession here spoken of "shall utterly exclude and disable" the party out of possession from any entry or claim thereafter to be made. And for fear these words were not sufficiently expressive, it is added that all such possession shall be a perpetual bar to all persons, etc. It might possibly have been understood from the wording of the former clause, "shall be utterly excluded from any entry or claim thereafter to be made," that the Legislature meant only to prevent *Page 25 
the entry or the action founded upon the right of possession, leaving the property or mere right unaffected, and to obviate such a mistake they have in the next clause carefully varied the expression, "shall be a perpetual bar to all and all manner of persons" — not only the claim and entry, but all persons shall be barred. Of what? Not of any particular action or means of getting possession, but generally and perpetually. Again: Feme coverts and the like persons "shall sue" within the time limited for them, "and at no time afterwards." Can it be meant that they shall never sue nor have any action whatsoever afterwards, and that all others may sue after the time limited for them, in a writ of right! When their disabilities are removed, they stand, in the view of reason and justice, in the same predicament as other claimants — certainly in no worse; they are not more in fault for not suing within the prescribed time than other claimants, yet they shall never bring any action afterwards: they are excluded from the privilege of suing, forever; and, consequently, so also must all others be, unless a sufficient reason can be assigned for placing these favored persons on a worse footing than others. Supposing this to be law, it were far better for them that the exception intended to benefit them had not been made; for, then, after the seven years were expired they might still sue a writ of right within sixty years, as the opinion supposes others may. Since, then, the bar formed by these clauses is a perpetual bar against all claims, allentries, all persons and all suits, it takes from the plaintiff all remedy, and consequently all title and right, and vests in the defendant, necessarily, the absolute dominion forever; or, in the (28) language of the law, an indefeasible fee simple. And as this accomplishes the object of the Legislature, which was to quiet possessions and to furnish the means of knowing with certainty from whom out of many claimants to purchase or buy lands with safety, and as that object would not be accomplished were the bar only temporary and the title still liable to be questioned in a writ of right, it seems to me that there can be little or no doubt but that is the true operation of the act, and of course that it is a mistake to say it bars the right of entry only. This reasoning is confirmed by the fact that there is no instance to be found in the judicial records of this country where a writ of right was ever instituted and maintained. If it were a sound position that the bar is but temporary, there must have been a great number of occasions rendering the use of that writ essential to the recovery of lands, the right of possession to which had been lost, though not the right of property; and there not being a single instance since 1715, is strong evidence to prove that it cannot be used, and that the exposition given by our ancestors, who were cotemporary with the first operations of the act, was that the clauses in question operated a perpetual bar. Upon no other ground can it be accounted for that the writ of right was never used; and, indeed, no reason can be assigned why the Legislature should desire that the plaintiff should be barred of his ejectment, but at the same time be able to recover in a writ of right. What motive could they have? How would that have promoted the design which influenced them in passing the act? Their design was to do away with the obstacles which opposed the settlement of the country. These were the uncertainty and perplexed situation of titles and the expectation of heirs under former grants. Was it promotive of this design that the possession introduced by the act should not render the title complete to all purposes, but should leave the possession *Page 26 
as much exposed to those heirs and their actions as before? and those who purchased under such possessions, no more certainty of an indefeasible title than before? I forbear to say anything of the nature and form of a writ of right, and of those by whom it is to be used, and of other circumstances incident to it; it is sufficient for my present purpose to be enabled to discover no substantial reason for preferring a recovery under that writ to a recovery in the action of ejectment, and it appears clear to me that such a distinction could not have been intended for any purpose, and therefore that it was not intended at all.
That a naked possession will operate the bar spoken of in the third and fourth clauses is as unfounded as the rest of the position. The remarks already made upon the causes of passing the act show that it was made to settle disputes among claimants under different grants for the same lands, and with that view only. This is the very reason why it never extended to the lords proprietors, so as to bar them by a naked possession of their lands, as it would have done (they being equally subjects with the settlers of the country) had it reached the case of disputes arising upon possessions unaccompanied with deeds or grants, or naked possessions. In the times preceding the act none pretended to hold lands by possession against a title by a deed or grant, nor was it conceived that possession could either make or bar a title. How could it, when no law existed for that purpose? 21 Jac. I., ch. 16, was not in force, nor, indeed, any statute made after the fourth year of his reign in the year 1607, that being the era of the settlement of the country legally authorized and continued. For want of such a property inherent in possession naturally, the act was passed to give it that property in certain instances and under certain restrictions. Before this period (29) no disputes were known between claimants by grant on the one hand and bare possession on the other. The law of those days rendered the grantee's title incontestable, when opposed by an adverse naked possession; no danger was to be apprehended in purchasing from such a grantee on account of the adverse possession. It is impossible in the nature of things that the act could have had for its object any disputes of that nature, which had not then been known or heard of, nor were foreseen. The idea of title by naked possession arose after the act, and originated in a misconception of its meaning, and has become a new source of litigation unknown to former times and not anticipated by the framers of the act. The claiming of lands by a naked possession against a title by a deed or grant has encouraged those having no title, colorable or otherwise, to settle upon the lands of others and commit trespasses, with a view of acquiring a title by a continuation of such trespasses for seven years together, and has made men believe that actions must be instituted against such trespasses to prevent the acquisition of title. Thus, an act which breathes the spirit of peace and quietness, which flowed from the solicitude to prevent lawsuits, as far as possible, and to remove the causes which perplexed men's titles, has been made the disturber of repose, the mother of inquietude, the stirrer up of controversies, and a net to entangle men's titles. Instead of discountenancing attempts to get lands by unfair means, without purchasing from the lords proprietors, or from those who have purchased from them; instead of repressing any practice of settling upon the lands of an honest purchaser, knowing that the settler commits a trespass in doing so, and the land belongs to another *Page 27 
and not to himself, it is made to encourage and to cherish such attempts and practices. We may perceive the soundest policy and justice in protecting the possessions and confirming the titles of those who have paid for their lands, obtained grants and deeds, and settled down upon them, and who have cleared, cultivated and improved them for seven years together, believing them to be their own; and who in all that time have received no information from a prior grantee or those standing in his place, of their better title. But we can perceive no motive for extending the same protection to a naked possessor or trespasser. A design of that kind is not to be inferred either from the nature of those controversies which existed prior to the act, the causes which gave birth to the act, or from any of the terms employed by it to signify its meaning, when compared with and explained by other parts; and therefore there is no ground to believe it to have actuated the makers in any degree: the less so, as the immediate consequences of the doctrine, the incompetency of the ejectment but the competency of the writ of right after the seven years, fabricate an arbitrary distinction, unfounded when applied to our circumstances, in any principle of convenience, policy or justice. For, with respect to the intention, why not recover in the ejectment after the seven years as well as in the writ of right? A distinction which has never been recognized by the practice of those who have gone before us has never been found necessary to be admitted as a part of our law prior to 1715 to 1799, during all which time the landed interests and rights of the people have been satisfactorily secured and protected, without the aid of the writ of right.
Innovations in law, like innovations in government, are dangerous experiments, since the extent of their influence cannot be foreseen. And it is now much to be doubted, since the act of 1778, ch. 5, whether, supposing a writ of right to be necessary, it can be deemed a part of the law of this State. From the foregoing remarks, admitting them to be just, it is to be collected that the second section of the act of limitations regards irregular, invalid and (30) informal conveyances, made before the act passed; that the third and fourth sections relate to cases where several persons have deeds or grants perfect enough in form for the same tract of land, and some of these persons under deeds or grants of a posterior date take and continue the possession for a considerable length of time; and that the true meaning and operation of the latter clauses are to confirm forever the title of all such persons having a color of title, who may continue in possession under such title for seven years without entry or suit in law, except as against persons laboring under incapacities mentioned in the fourth clause, and as against them, also, if they shall not sue within the time limited after the disabilities shall be removed, but not to create any title de novo, upon the ground of possession or otherwise.
The foregoing observations of Mr. Haywood have had the effect of changing the current of decisions and unsettling the opinions of the profession as to the construction of the act of limitations; and at the distance of an hundred years from the passage of this act, more diversity of opinion seems to exist as to its true meaning and operation than at any preceding period; and perhaps nothing short of legislative interference will remove difficulties which present themselves in any view which has been taken of this act. It may be doubted whether in the present condition of the country, whilst men *Page 28 
claim title to large tracts of land and have the actual possession of only a small part thereof, and when the lines of those tracts are neither distinctly marked nor generally known, it be practicable to establish any rule upon the subject which will not be liable to abuse and attended with inconvenience.
Upon general principles, regardless of the phraseology of the act of limitations, a possession which is to bar one man of his right and vest that right in another ought (1) to be an honest possession, or at least honestly acquired; (2) the extent of the claim of the possessor ought to be ascertained and notorious; and (3) the possession should be continued for such time as would raise a violent presumption that no adverse claim exists; and it is fair to presume the Legislature intended that the possession under the act of 1715 should be of this character. The Legislature could not have intended to protect fraudulent possessions, nor possessions evidencing no certain extent of claim. It would seem strange that the law, which searches fraud in all its recesses and delights in expelling it wheresoever else it can be found, should in cases of possession spread over it the mantle of protection; and it would seem equally strange that the law should give any operation to a possession which does not furnish to the world any evidence of the extent of the possessor's claim — to a possession which gives no notice whether the possessor claims five hundred or a thousand acres. In England (and it may be the case in this country an hundred years hence) little inconvenience exists upon this point; the extent of every possessor's claim is notorious. But here it often happens that a man settles down upon a tract of land without making known the boundaries to which he claims, and he subsequently sets up a claim to suit his convenience. This evil seems to have determined the judges to the opinion (so far as that opinion was founded upon reasons of policy) that color of title was necessary to give operation to a seven years' possession. The experience of several years has rendered it very questionable whether there was not more policy in the rule formerly enforced, "That seven years' possession, with a claim to known and marked boundaries, should be operative to bar the entry of (31) adverse claimants." For, under this rule, to enable a man to ripen his possession into a title, it became necessary for him to have known and marked lines or natural boundaries, and to make known his claim to those lines or boundaries for the space of seven years together. Whereas, under the present rule, a man may settle down upon a tract of land under color of title and claim to the boundaries called for in his title, without even knowing where those boundaries are. A beginning corner is marked, and the lines of his land have not been surveyed; a plat of the lines is made out by the surveyor and the deed written from the plat. This rule substitutes the color of title, and the place of "the claim to known and marked lines or natural boundaries" required by the former rule. Which rule best ascertains the extent of the possessor's claim? The possessor with color of title is supposed to claim to the lines called for in his deed; but the rule now enforced does not require the possessor to make out those lines, nor to make his claim to them notorious, nor even to register his deed, that others may be informed what lines are called for in it. What is the consequence? A man having a deed for a large tract of land settles down upon one corner of it and resides there for seven years, during all which time he neither has his land surveyed, the lines marked, nor his deed registered; at *Page 29 
the end of seven years he registers his deed, has his land surveyed, and the lines are found to include one-half of an adjoining tract for which his neighbor has an elder deed, but not the actual possession; and upon the principle that the possession of part is the possession of the whole tract covered by his deed, he gets his neighbor's land without having given to him or to any other person notice that he had a claim to it. The rule requiring color of title is thus made to work the most manifest injustice, and become a most convenient means of effecting fraud. It surely, then, is an object worthy of further judicial inquiry, whether there be anything in the act of 1715 imperatively demanding color of title to give effect to a seven years' possession; and, if there be not, whether the interest of the community will not be consulted by reviving and enforcing the former rule, and enlarging its operation, by permitting the man against whom the seven years' possession is set up to defeat this possession by showing that it had been fraudulently acquired; that the possessor knew at the time he acquired possession the title was in some other person; in other words, that he had such notice as was sufficient to put him upon an inquiry as to the title of the true owner.
The statute of 21 Jac. I., ch. 16, had been in operation for more than a century when the act of 1715 was passed. Its construction had been settled; and if it be admitted that it was not in force in this State, it cannot be denied that its construction was well known to the framers of the act of 1715. They knew that under that statute the courts had uniformly held that twenty years' naked possession barred the entry of adverse claimants, except of those laboring under the disabilities enumerated in the statute. When, therefore, they drew the third and fourth clauses of the act of 1715 (which were to operate upon future cases) in the same words, to every substantial purpose, with the statute of 21 Jac. I., they must have intended that those clauses should receive the same construction with the like clauses in that statute. The earliest accounts which have been transmitted to us of the construction which the courts in this State gave to this act, inform us that they had adopted the construction which had been given to the statute of 21 Jac. I. upon this point. The construction continued to be given to the act for more than twenty years after the American Revolution, when the doctrine of color of title was advanced, which, being urged with much zeal and ability, gained converts, until it supplanted the construction which the act had received for nearly a century. It is not intended to discuss this point at length, but to invite further attention to it, that something more may be done by the proper tribunals "to quiet men in their possessions and to avoid suits in law."